IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **ALEX COATNEY,** | ) | |
| **H.S. and B.H., by and through their** | ) | |
| **Guardian DONNA HILAND, and** | ) | |
| **N.S., by and through her Guardian** | ) | |
| **JENNIFER PALLONE,** *individually* | ) | |
| *and on behalf of similarly situated* | ) | |
| *individuals,* | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21-cv-1368-DWD** |
| | ) | |
| **ANCESTRY.COM DNA, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

**DUGAN, District Judge:**

Plaintiffs Alex Coatney, and H.S., B.H., and N.S., by and through their guardians, individually and on behalf of other similarly situated individuals, bring this putative class action against Defendant Ancestry.com DNA, LLC ("Ancestry"), alleging violations of the Illinois Genetic Information Privacy Act, 410 Ill. Comp. Stat. Ann. 513/1, *et seq.* ("GIPA"). Plaintiffs contend that Ancestry violated their privacy rights by disclosing confidential genetic information to unauthorized third parties without their written consent (Doc. 19, ¶ 1, 21-22, 25-27).

Now before the Court is Defendant's Motion to Compel Arbitration (Doc. 21).[1] Plaintiffs filed a Response in Opposition (Doc. 27) to which Defendant replied (Doc. 28).

---

[1] Defendant's prior Motion to Compel Arbitration directed at Plaintiffs' First Amended Complaint (Doc. 18) is **DENIED, as moot**.

The Court held a hearing on the Motion on May 3, 2022, and Plaintiffs filed a supplement on June 30, 2022 (Doc. 33).  Having considered the briefing and arguments of the parties, and as further detailed below, the Motion will be denied.

## Background

Ancestry is a genetic testing services company that sells genealogy tools and DNA testing kits to customers around the world (Doc. 19, ¶¶ 16-19).  Plaintiffs' DNA tests were registered, submitted, and processed by Ancestry while they were minors.  Plaintiffs do not have registered accounts with Ancestry, however, each of their Guardians, Coatney, Roberts, and Pallone (the "Guardians"), used their registered Ancestry accounts to submit Plaintiffs' DNA tests to Ancestry.  To register their accounts, the Guardians provided their names and email addresses, created passwords, and accepted Ancestry's Terms and Conditions that were in effect at the time of their registration (Doc. 21-1). [2]

Ancestry updated its Terms and Conditions no less than ten (10) times from the time of Guardian Pallone's registration in 2006 until the filing of Plaintiffs' initial complaint.[3]   Each of those versions of the Terms and Conditions contained a provision allowing Ancestry to unilaterally modify the Terms and Conditions at any point and provide notice to users via email or a banner on their website.  Continued use of

---

[2]Alex Coatney's Guardian registered an account on November 25, 2017, when Ancestry's March 2015 Terms and Conditions were in effect (Doc. 21-1, ¶ 3; Doc. 21-2).  H.S. and B.H.'s Guardian registered an account on August 29, 2015, also when Ancestry's March 2015 Terms and Conditions were in effect (Doc. 21-1, ¶ 13; Doc. 21-8).  N.S.'s Guardian registered an account on May 20, 2006, when Ancestry's September 2005 Terms and Conditions were in effect (Doc. 21-1, ¶ 23; Doc. 21-14).
[3]Ancestry's Terms and Conditions were updated on September 21, 2005 (Doc. 21-16), January 10, 2008 (Doc. 21-17), July 6, 2009 (Doc. 21-18), October 6, 2010 (Doc. 21-19), February 22, 2012 (Doc. 21-20), April 26, 2012 (Doc. 21-21), August 1, 2014 (Doc. 21-22), March 17, 2015 (Doc. 21-4), December 14, 2017 (Doc. 21-6), June 5, 2018 (Doc. 21-11), and July 25, 2019 (Doc. 21-12).

Ancestry's product or services after being notified of a change in the Terms would constitute acceptance of the updated Terms.  The parties do not argue that any of the Guardians disaffirmed Ancestry's Terms or have deleted their accounts.  Thus, it is undisputed that the most recent Terms and Conditions, the 2019 Terms (Doc. 21-12), apply to the relationship between Ancestry and the Guardians.

However, the parties dispute whether the 2019 Terms, or any version of the Terms and Conditions, apply to Plaintiffs.  Plaintiffs maintain that no version of the Terms and Conditions can apply to them.  Whereas Defendant appears to argue that the 2019 Terms, or some other version of the Terms and Conditions, do apply to Plaintiffs.  For the most part, each version of the Terms and Conditions contain similar provisions, and any differences are not particularly relevant to the parties' dispute.  However, because different terms and conditions were in effect when Plaintiffs' tests were activated – the point in time when Defendant alleges that Plaintiffs agreed to its Terms and Conditions -- the Court will detail the relevant differences between those versions.

Plaintiff Alex Coatney's DNA test was registered on December 29, 2017 (Doc. 21-1, ¶ 12)[4],  Plaintiff H.S.'s DNA test was registered on August 18, 2019 (Doc. 21-1, ¶ 22)[5], Plaintiff B.H.'s DNA test was registered on September 25, 2019 (Doc. 21-1, ¶ 22)[6], and Plaintiff N.S.'s DNA test was registered on January 10, 2016 (Doc. 21-1, ¶ 22)[7].  Thus, the Court reviews the March 2015, December 2017, and July 2019 Terms and Conditions (*See*

---

[4] At this time, the December 2017 Terms and Conditions were in effect.
[5] At this time, the July 2019 Terms and Conditions were in effect.
[6] At this time, the July 2019 Terms and Conditions were in effect.
[7] At this time, the March 2015 Terms and Conditions were in effect.

Doc. 21-4; Doc. 21-6; Doc. 21-12).  As is relevant to the current Motion, these versions all

contain a dispute resolution clause requiring binding arbitration.

The 2019 Terms and Conditions' dispute resolution clause states:

**13. Dispute Resolution, Arbitration and Class Action Waiver**
                    …
You and Ancestry agree that these Terms affect interstate commerce and
that the Federal Arbitration Act governs the interpretation and enforcement
of these arbitration provisions.

If any dispute between us is not resolved within 30 days after contacting us,
then you and Ancestry agree that we will resolve it through final and
binding arbitration …

<u>Arbitration Rules</u>: Arbitration may be conducted by JAMS in accordance
with the JAMS Streamlined Arbitration Rules for claims that do not exceed
$250,000 and the JAMS Comprehensive Arbitration Rules and Procedures
for claims exceeding $250,000 in effect at the time the arbitration is initiated,
excluding any rules or procedures governing or permitting class actions.
**The arbitrator, and not any federal, state, or local court or agency, shall
have exclusive authority to resolve all disputes arising out of or relating
to the interpretation, applicability, enforceability, or formation of these
Terms or the Privacy Statement, including but not limited to any claims
that all or part of these Terms or Privacy Statement is void or voidable,
whether a claim is subject to arbitration, or the question of waiver by
litigation conduct.** The arbitrator shall be empowered to grant whatever
relief would be available in a court under law or in equity. The arbitrator's
award shall be written and shall be binding on the parties and may be
entered as a judgment in any court of competent jurisdiction.
                    . . .
<u>Survival</u>: This Arbitration and Class Waiver section shall survive any
termination of your account or the Services.

(Doc. 21-12, ¶ 13).

The 2017 Terms and Conditions' dispute resolution clause states:

**13. Dispute Resolution**

We work hard to keep our customers satisfied. If a dispute arises between
you and Ancestry, our goal is to provide a cost-effective means of quickly

4

resolving the dispute. If you have any concern or dispute about the Services, you agree to first try to resolve the dispute informally by contacting us.

…

If your dispute is not resolved within 30 days after contacting us, then you and Ancestry agree that we will resolve it through final and binding arbitration …

Arbitration Rules: To begin an arbitration proceeding, send a certified letter requesting arbitration and describing your claim to the Ancestry Legal Department, 153 Townsend Street, Suite 800, San Francisco, CA 94107. Any arbitration will be conducted by the American Arbitration Association (AAA) under its rules and will be held in the State of Utah.

…

This dispute resolution process will continue after you have stopped using the Services.

(Doc. 21-6, ¶ 13).

The 2015 Terms and Conditions' dispute resolution clause states:

**8. Governing Law; Disputes**

By using the Services or the Websites, you agree that the Federal Arbitration Act, applicable federal law, and the law of the State of Utah, without regard to its principles on conflicts of laws, will govern these Terms and Conditions, your use of the Websites and the Services, and any dispute of any sort that may arise between you and Ancestry.

If a dispute arises between you and Ancestry, our goal is to provide you a neutral and cost effective means of resolving the dispute quickly. To that end, you agree to first contact Ancestry Customer Support by phone or email via the contact information below to describe the problem and seek a resolution. If that does not resolve the issue, then **you and Ancestry agree that any dispute or claim relating to your use of the Services or Websites shall be resolved through binding arbitration, rather than in court, except that you may assert claims in small claims court if your claims qualify.**

. . .

**You and Ancestry agree that each may bring claims against the other only in your or its individual capacity, and not as a plaintiff or class member in any purported class, consolidated, or representative action. Further, unless both you and Ancestry agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise**

5

**preside over any form of a representative or class proceeding. Notwithstanding the foregoing, this arbitration agreement does not preclude you from bringing issues to the attention of the federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. This entire arbitration provision shall survive termination of this Agreement and the termination of your Ancestry membership(s).**

To begin an arbitration proceeding, you must send a certified letter requesting arbitration and describing your claim to the Ancestry Legal Department, Ancestry.com Operations Inc., 1300 W Traverse Parkway, Lehi, UT 84043.   This arbitration will be conducted by the American Arbitration Association (AAA) under its <u>rules</u>, including the Commercial Dispute Resolution Procedures and the Supplementary Procedures for Consumer Related Disputes of the AAA, as modified by this Agreement (collectively, "AAA Rules"). The AAA Rules and costs are available online at www.adr.org or by calling the AAA at 1-800-778-7879.

(Doc. 21-4, ¶ 8).

Further, all versions of the terms clarified that Defendant's services, including its

DNA services, are intended for adults.  However, the terms contemplate minors using

Defendant's services through accounts managed by the minor's parent or legal guardian.

The 2019 and 2017 Terms and Conditions both provide:

**1.  Eligibility to Use the Services**

Users of the Services may include unregistered guests, free registered guests, paid subscribers, and people who purchase and/or active a DNA kit ("**Users**"). You may need to create an account to use the Services. … The Services are intended for adults in the countries where they are being offered. …

<u>DNA Services</u>: You must be at least 18 years old to purchase or activate a DNA kit. To protect your privacy when you share your DNA with us, each adult who submits a saliva sample for a DNA test must create their own account. … A parent or legal guardian may activate a DNA test, provide us Personal Information, and send us the saliva sample of a minor child for processing using an account for that child that is directly managed by the parent or legal guardian. By activating a DNA test for, or submitting any

Personal Information about, a minor you represent that you are the minor's parent or legal guardian. You also agree that you have discussed the DNA test with the minor and the minor has agreed to the collection and processing of their saliva.

Other Services: While our other Services are intended for adults, if you are between the ages of 13 and 18, you may use the other Services with your parent's or guardian's permission. Children under the age of 13 are not permitted to use any Services. …

## 2.  Your Use of the Services

Requirements for Using the Services: In exchange for your access to the Services, including the DNA Services described below, you agree: … You are responsible for all usage and activity on the Services made via your account …

## 3.  Additional Terms Applicable to Your Use of DNA Services

As used in these Terms, the "**DNA Services**" refers to the use of our DNA collection kit, processing and handling of your DNA sample, genetic testing of your DNA sample, and our web or mobile app-based tools that provide you with ethnicity and other genetically related results and associated services, offer you the ability to view genetic matches that can identify potential relatives, help you explore your ethnic and family origins, and make new discoveries through your DNA.

The purpose of the DNA Services is to provide genetic and genealogy results and related reports for your informational, recreational, educational, and research use. …

Requirements for Using the DNA Services: By using the DNA Services you also agree: … Any saliva sample you provide is either your own or the saliva of a person for whom you are a parent or legal guardian; …

(Doc. 21-12, pp. 3-6; 21-6, pp. 3-5).

The March 2015 Terms provide:

The Websites and Services provided herein are intended for adults. When a minor uses the Websites, the parent or guardian of that minor will be held responsible for the minor's actions.

. . .

7

> By submitting User Provided Content to any of the Websites, you represent and warrant that you have the right to do so or that you have obtained any necessary third party consents (e.g., under privacy or intellectual property laws).

(Doc. 21-4, pp. 3, 5).

In addition to the requirements in the relevant Terms and Conditions, to activate the Plaintiffs' DNA tests, the Guardians had to complete consent forms for the minors (Doc. 21-7; Doc. 21-13; Doc. 21-23).  The form used to activate Alex, H.S., and B.H.'s tests required their Guardians to generally complete four steps:

*First*, the Guardians signed into their respective accounts, entered an activation code, and affirmed that they were the parents or legal guardians of the person providing the DNA sample (Doc. 21-7; Doc. 21-13).[8]

*Second*, the Guardians reviewed "the terms of the DNA Processing Consent" form, which stated:

> When you activate your child's DNA test kit, you consent to Ancestry's collection and processing of your child's DNA and other sensitive Personal Information (such as your child's ethnicity, national origin or health history) to:
>
> - Convert the physical DNA sample into DNA data and use your child's DNA data to provide reports about your child's ancestral origins in the form of an ethnicity estimate, geographical sub-region details, and migrations as well as personal insights related to your child's ethnicity, places of origin, ancestors, individual traits, and characteristics.
> - Invite to participate in surveys and questionnaires (entirely optional) on behalf of your child, through which we may gather more Personal Information for additional insights.

---

[8] As detailed in the Declaration of Brian Donnelly, Defendant's Senior Vice President and General Manager (Doc. 21-1), these consent forms are illustrative of the consent forms the Guardians used to activate the minors' DNA tests, but do not represent the exact information the guardians supplied to Ancestry when activating the minors' accounts.  Plaintiffs do not dispute the accuracy of these forms.

- Identify your child's potential relatives in our database by comparing your child's DNA data to other Ancestry customer's DNA data.
- Use your child's DNA data, family tree details, and other Personal Information to help you and your child discover other details about your family history, including ancestors you may share with other Ancestry members. This information can help you build your family tree or help you trace your ancestors' migration paths.
- Provide consistent quality and improve Ancestry product features and services.
- Help create new product features and services, including products related to wellness and health.

(Doc. 21-7; Doc. 21-13).  To continue, the Guardians checked a box next to the following language "I consent to the collection and processing of my child's DNA data and other sensitive Personal Information as described above." (*Id.*).

*Third*, a review page confirmed that Plaintiffs' DNA results would be managed and sent to the Guardians, and the Guardians selected whether to receive weekly emails or text updates about the Plaintiffs' DNA results (*Id.*).

*Fourth*, the Guardians clicked an "activate kit" button to finish the activation process (*Id.*).

Similarly, the form used to activate N.S.'s DNA test, required Guardian Pallone[9] to follow four steps:

*First*, Guardian Pallone was required to sign into her account, enter an activation code, and affirm that she was the parent or legal guardian of "the person providing the DNA for the test" (Doc. 21-23).

---

[9]According to Defendant's business records, an individual named William Stoner used Ms. Pallone's account to activate N.S.'s DNA test (*See* Doc. 21-1, ¶ 32).  The parties do not highlight this discrepancy or argue that this fact has any impact on the current dispute.

*Second*, Guardian Pallone checked a box next to the following language: "I have read and accept the AncestryDNA Terms and Conditions" (*Id.*).

*Third*, Guardian Pallone was asked to review terms and decide whether to participate in Defendant's Research Project (*Id.*).  The record does not indicate whether Guardian Pallone agreed to join the research project, however, agreeing to join the research project was not required to activate a DNA kit.

*Fourth*, a review page confirmed that N.S.' DNA results would be registered to and administered by Guardian Pallone's account (*Id.*).  Guardian Pallone then clicked an "Activate This Test" button to finish the activation process (*Id.*).

<u>**Discussion**</u>

Defendant moves to compel arbitration under the Federal Arbitration Act ("FAA"). The FAA mandates that courts enforce valid, written arbitration agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2). This mandate reflects a federal policy that favors arbitration and "places arbitration agreements on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  Arbitration should be compelled under the FAA when "three elements are present: (1) an enforceable written agreement to arbitrate, (2) a dispute within the scope of the arbitration agreement, and (3) a refusal to arbitrate." *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1060 (7th Cir. 2018) (citing 9 U.S.C. §§ 3–4).

Courts are responsible for deciding whether an agreement to arbitrate exists before ordering arbitration. *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 741–42 (7th Cir. 2010).  In doing so, the Court turns to state contract law to determine whether a binding arbitration

10

agreement exists.  *Janiga*, 615 F.3d at 742; *Tinder*, 305 F.3d at 733 (citing  9 U.S.C. § 2); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).  Here, the parties agree that Illinois law applies.  (Doc. 21, p. 7; Doc. 27, p. 3).[10]  Once a court is satisfied that an agreement to arbitrate exists, the FAA instructs the court to stay proceedings on issues subject to arbitration and compel arbitration pursuant to the agreement. 9 U.S.C. § 3-4.

Nevertheless, parties are permitted to delegate gateway issues, including the question of whether an arbitration agreement exists, to the arbitrator.  *See K.F.C. by & though Clark v. Snap, Inc.*, No. 3:21-CV-9-DWD, 2021 WL 2376359, at *3 (S.D. Ill. June 10, 2021), *aff'd sub nom. K.F.C. v. Snap Inc.*, 29 F.4th 835 (7th Cir. 2022) (7th Cir. 2022) (citing *Ed's Pallet Servs., Inc. v. Applied Underwriters, Inc.*, No. 15-CV-1163-SMY-SCW, 2017 WL 9287091, at *3 (S.D. Ill. Apr. 7, 2017) (collecting cases).  Here, Defendant argues that the gateway questions of formation and whether a valid arbitration agreement exists have been delegated to the arbitrator because of the following delegation clause in the 2019 Terms and Conditions:

> **The arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability, or formation of these Terms or the Privacy Statement, including but not limited to any claims that all or part of these Terms or Privacy Statement is void or voidable, whether a claim is subject to arbitration, or the question of waiver by litigation conduct.**

(Doc. 21-12 at ¶ 13).

---

[10] *See Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflicts of laws unless the parties disagree on which state's law applies").

The 2019 Terms also incorporate the JAMS Streamlined Arbitration Procedure Rules ("JAMS Rules") (Doc. 21-12 at ¶ 13).   District courts routinely hold that the incorporation of specific arbitral rules into arbitration provisions demonstrate an intent to submit gateway issues to arbitration.   *See K.F.C. by and though Clark*, 2021 WL 2376359, at *3; *see also Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452, 458 (N.D. Ill. 2021) (Arbitration clauses which incorporate the JAMS rules, or other similarly worded arbitral rules, provide "'clear and unmistakable' evidence that the parties agreed to arbitrate "'arbitrability'").

It is undisputed that the Guardians signed user agreements which are now subject to the 2019 Terms and its arbitration provision.   Further, the express delegation provision and incorporation of the JAMS Rules provide clear and unmistakable evidence of an intent to delegate threshold issues of formation, enforceability, and scope to the arbitrator.   It is therefore clear that Defendant ___**and the Guardians**___ agreed to delegate gateway issues to the arbitrator.[11]   However, the Court must still decide whether Plaintiffs – who do not have an Ancestry account and did not sign Ancestry's Terms and Conditions – are also bound by their Guardians' user agreements and those arbitration provisions.   *See K.F.C. v. Snap Inc.*, 29 F.4th at 837 ("Even the most sweeping delegation cannot send the contract-formation issue to the arbitrator, because, until the court rules that a contract exists, there is simply no agreement to arbitrate.").

---

[11] The Court would reach the same conclusion based on the arbitration clauses in the 2015 and 2017 Terms and Conditions, as those versions of the Terms specifically incorporated the rules of the American Arbitration Association.  (Doc. 21-6, ¶ 13; Doc. 21-4, ¶ 8). As such, persons bound to those versions of the Terms would also have agreed to delegate threshold issues to the arbitrator. *See Sha-Poppin Gourmet Popcorn LLC*, 553 F. Supp. 3d at 458.

"Generally, a court cannot compel a party to arbitrate a dispute unless that party has agreed to do so." *Warciak v. Subway Restaurants, Inc.*, 880 F.3d 870, 872 (7th Cir. 2018); *see also E. River Cap., Inc. v. VLD Access, Inc.*, No. 19-CV-1398-JPG, 2020 WL 4003292 (S.D. Ill. July 15, 2020), at *5 (citing *A.D.*, 885 F.3d at 1059) (Normally "an arbitration agreement does not bind someone who did not sign the agreement containing the arbitration clause.")).  However, there are exceptions to this general rule based in traditional state law contractual theories, such as assumption, agency, and estoppel.  *Everett v. Paul Davis Restoration, Inc.*, 771 F.3d 380, 383 (7th Cir. 2014) ("Typically, the fact that [Plaintiffs] never signed the franchise agreement would be the end of our discussion.  However, the obligation to arbitrate a dispute is not always limited to those who have personally signed an agreement containing such a provision."); *see also Warciak*, 880 F.3d at 872 (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)); *A.D.*, 885 F.3d at 1060.

Defendant presents two general theories which purportedly bind Plaintiffs to the arbitration agreements in Defendant's Terms and Conditions.  First, Defendant argues that Plaintiffs assented to the Terms and Conditions by either (a) agreeing to use Defendant's services to submit their DNA tests through their Guardians' accounts, or (b) because the Guardians executed the relevant consent forms on Plaintiffs' behalf.  Alternatively, Defendant maintains that equitable principles bind Plaintiffs to the Terms and Conditions because Plaintiffs received the benefit of using Defendant's services.

## I.      Assent to the Terms and Conditions

Defendant argues that Plaintiffs are bound to the arbitration provisions in Defendant's Terms and Conditions because Plaintiffs manifested an affirmative intent to

13

be bound to the Terms either (a) by consenting to use Defendant's services to submit their DNA tests or (b) because they authorized their Guardians to execute the relevant consent forms on Plaintiffs' behalf.  In response, Plaintiffs summarily refute that they agreed to use Defendant's services at all.  Instead, Plaintiffs imply that their Guardians acted unilaterally in submitting Plaintiffs' DNA to Defendant.

"Arbitration is contractual." *CCC Intelligent Solutions Inc., v. Tractable Inc.*, 36 F.4th 721, 723 (7th Cir. 2022) (citing *Morgan v. Sundance, Inc.*, 212 L. Ed. 2d 753 (May 23, 2022)). Therefore, the Court turns first to the purported contract language to determine whether the Terms and Conditions and/or consent forms include Plaintiffs' consent to be bound to Defendant's Terms and Conditions.  In Illinois, the goal in determining whether a contract exists "is to give effect to the intent of the parties as demonstrated through objective conduct." *Janiga*, 615 F.3d at 742 (citing *Carey v. Richards Bldg. Supply Co.*, 367 Ill. App. 3d 724 (2006)); *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 389 (7th Cir. 2009); *Gallagher v. Lenart*, 226 Ill. 2d 208 (2007)).  The starting point for this analysis is the agreement's language, of which courts "endeavor to give that language 'its plain and ordinary meaning.'" *Romspen Mortg. Ltd. P'ship v. BGC Holdings LLC - Arlington Place One*, 20 F.4th 359, 372 (7th Cir. 2021) (citing *Gallagher*, 226 Ill. 2d 208).  "If the terms of the contract are unambiguous, the court must enforce the contract as written." *Janiga*, 615 F.3d at 742–43 (citing *Lewitton*, 585 F.3d at 380).

Defendant argues that Plaintiffs assented to the Terms and Conditions when they agreed to use Defendant's services to submit their DNA tests to Defendant through their Guardians' registered accounts.  Here, Defendant relies on the plain language of the

14

Terms which required the Guardians to obtain consent from Plaintiffs prior to submitting

Plaintiffs' DNA:

> DNA Services: You must be at least 18 years old to purchase or activate a DNA kit. To protect your privacy when you share your DNA with us, each adult who submits a saliva sample for a DNA test must create their own account. … A parent or legal guardian may activate a DNA test, provide us Personal Information, and send us the saliva sample of a minor child for processing using an account for that child that is directly managed by the parent or legal guardian. By activating a DNA test for, or submitting any Personal Information about, a minor you represent that you are the minor's parent or legal guardian. You also agree that you have discussed the DNA test with the minor and the minor has agreed to the collection and processing of their saliva.

(Doc. 21-12, pp. 3-6; 21-6, pp. 3-5).

> By submitting User Provided Content to any of the Websites, you represent and warrant that you have the right to do so or that you have obtained any necessary third party consents (e.g., under privacy or intellectual property laws).

(Doc. 21-4, pp. 3, 5). Defendant maintains that because Plaintiffs were required to give

consent before submitting their DNA to Defendant, and Plaintiffs could not have

independently used Defendant's services without their Guardians' account, then by

consenting to submit their DNA, Plaintiffs necessarily consented to be bound by

Defendant's Terms and Conditions.

The plain language of all relevant versions of the Terms and Conditions make clear

that the Guardians were required to obtain some level of consent from Plaintiffs before

submitting their DNA to Defendant. Whether such consent was or, given their minority,

could be effectively granted is not clear. However, the Court is not convinced that this

consent also included Plaintiffs' assent to be bound by Defendant's Terms and

Conditions.  Indeed, the plain language of the Terms relevant to Alex, H.S., and B.H.'s DNA tests required the Guardians to discuss the DNA test with the minors, and then the minors had to "agree[] to the collection and processing of their saliva."  (Doc. 21-12, pp. 3-6; 21-6, pp. 3-5).  Whereas the plain language of the Terms relevant to N.S.'s test required Guardian Pallone to represent that Guardian Pallone had the right to submit N.S's "User Provided Content" and that Guardian Pallone had "obtained any necessary third party consents" (Doc. 21-4, pp. 3, 5).

While Illinois maintains a "pro-arbitration policy" this policy does not "render arbitration agreements more enforceable than other contracts, and it does not operate [to disregard] the intent of the contracting parties." *Hartz v. Brehm Preparatory Sch., Inc.*, 2021 IL App (5th) 190327.  The plain language of the Terms and Conditions is not ambiguous; thus, the court must enforce it as written. *Janiga*, 615 F.3d at 742–43 (citing *Lewitton*, 585 F.3d at 380).  The relevant documents state that Plaintiffs consented to the "collection and processing of their saliva" or to "submit User Provided Content."  However, nothing in those documents suggest that Plaintiff consented to anything more, or that this consent also included Plaintiffs' affirmative agreement to be bound by Defendant's Terms and Conditions.  The Court declines to read into the written documents words which are not there.  *See Hartz*, 2021 IL App (5th) 190327 ("[A]n arbitration agreement will not be extended by construction or implication.") (citing *Carter v. SSC Odin Operating Co., LLC*, 2012 IL 113204, ¶ 55).  Accordingly, the Court declines to find that the record supports Defendant's assertion that Plaintiffs assented to the specific terms of the Terms and Conditions when agreeing to the "collecting and processing" of their DNA.

Next, Defendant contends that Plaintiffs manifested an independent intent to be bound by the Terms and Conditions by authorizing their Guardians to execute the consent forms and submit their DNA for processing through the Guardians' accounts. As detailed above, all relevant versions of the Terms and Conditions required the Guardians to obtain consent from Plaintiffs before submitting Plaintiffs' DNA tests to Defendant (Doc. 21-12, pp. 3-6; 21-6, pp. 3-5). Consistent with this language, the consent forms used to activate Plaintiffs' DNA tests required the Guardians for Alex, H.S., and B.H. to affirm that they were Plaintiffs' parents or legal guardians and then "consent to the collection and processing of my child's DNA data and other sensitive Personal Information" (Doc. 21-7; Doc. 21-13). N.S.'s Guardian similarly had to affirm that they were N.S.'s parent or legal guardian and had read and accepted "the Ancestry DNA Terms and Conditions" (Doc. 21-23).

Defendant argues that the combination of language in the consent forms, along with Plaintiffs' consent to submit their DNA tests to Defendant, indicate that the Guardians executed the consent forms on Plaintiffs' behalf, thus binding Plaintiffs to Defendant's Terms and Conditions. This argument, however, is not plainly apparent from the plain language of the consent forms. Indeed, nowhere on the face of the consent forms do the forms convey that the Plaintiffs, either in addition to their Guardians, or independent of their Guardians, were executing the consent forms. Instead, the consent forms refer only to a singular individual opposed to an agent signing on behalf of another. That singular individual is also referred to as the parent or guardian for the person providing the DNA sample.

17

For example, the forms used to activate Alex, H.S. and B.H.'s DNA tests consistently refer to a singular actor, "you", who is initiating their "child's DNA test." (*See* Doc. 21-7; Doc. 21-13) ("When **you** activate **your child's** DNA test kit, **you** consent to Ancestry's collection and processing of **your child**'s DNA data and other sensitive Personal Information. … **I** consent to the collection and processing of **my child's** DNA data and other sensitive Personal Information as described above." (emphasis added). N.S.'s form also refers to a singular actor, "you", who is identified as the parent or guardian for the person providing the DNA sample, and who is also the same person who affirms that they read and accept the Terms and Conditions.  (Doc. 21-23) ("**I** have read and accept the AncestryDNA Terms and Conditions.") (emphasis added).

Defendant cites to multiple cases where courts have enforced arbitration agreements against minors.[12]  However, these cases are all factually distinguishable from the facts presented here in three ways.  In the first set of cases, the relevant agreements were signed by both the guardians and the minors, or otherwise clearly expressed that one party was signing the agreement on behalf of the other.  *See Burns v. Wilderness Ventures, Inc.*, No. 12 C 4188, 2012 WL 3779069 (N.D. Ill. Aug. 30, 2012) at *3 (the relevant agreement was signed by both the guardian and the child, and clearly stated (1) "**We** understand and agree that the laws of the State of Wyoming govern this document" and (2) that the guardian signs "**on behalf of** [the child], myself, and my spouse …") (emphasis added); *Wylie v. Island Hotel Co. Ltd.*, No. 15-24113-JLK, 2018 WL 3421374, at *3

---

[12] Some of these cases involve the enforcement of forum-selection clauses, however, the analysis is relevant here because an arbitration clause "is a type of forum selection clause" *See Jackson v. Payday Fin., LLC*, 764 F.3d 765, 773 (7th Cir. 2014).

(S.D. Fla. July 13, 2018), *aff'd*, 774 F. App'x 574 (11th Cir. 2019) (The relevant agreement stated "I represent and warrant that **I have authority to sign on behalf of myself and the members of my traveling party** [which included Plaintiff])") (emphasis added); *Glob. Travel Mktg., Inc. v. Shea*, 908 So. 2d 392, 395 (Fla. 2005) (the agreement provided "I, as parent or legal guardian of the below named minor, hereby give my permission for this child or legal ward to participate in the trip and further **agree, individually and on behalf of my child or ward**, to the terms of the above.") (emphasis added).[13]

In the second set of cases, the minor acted independent of their guardians in using the defendant's services. *See Dillon v. Ski Shawnee, Inc.*, No. CIV.A. 13-7155 JAP, 2014 WL 3900877, at *2 (D.N.J. Aug. 11, 2014) (minor plaintiff and her mother each had separate ski lift tickets, each containing a forum selection clause, and the minor plaintiff and her mother both used defendant's services); *Vega-Perez v. Carnival Cruise Lines*, 361 F. Supp. 2d 1 (D.P.R. 2005) (finding that minor plaintiff, as a guest of a cruise ship, had a separate travel ticket for the cruise and the ticket specifically provided that the "Guest" agreed to the forum selection clause).

Finally, in the third set of cases, the courts held that a minor could not disaffirm the arbitration provisions under an equitable based theory. *See Leong v. Kaiser Found. Hosps.*, 71 Haw. 240, 248–49 (1990) (finding that the minor could not disaffirm an

---

[13] *See also Cross v. Carnes*, 132 Ohio App. 3d 157, 168–69 (1998) (noting that the relevant form was signed by the parent "on behalf of her daughter" and that the parent "consented to the terms of the release on her daughter's behalf"); *see also Hojnowski v. Vans Skate Park*, 187 N.J. 323, 345 (2006) (collecting cases, and observing that cases where courts declined to exercise an arbitration provision against a minor turned on the explicit language in the individual contracts).

arbitration provision because he was a third party beneficiary of the contract); *See also E.K.D. ex rel. Dawes v. Facebook, Inc.*, 885 F. Supp. 2d 894, 898–900 (S.D. Ill. 2012) (holding that minor plaintiffs could not disaffirm forum-selection clause in Facebook user agreement because they had already accepted the benefits of the contract by using Facebook); *Sheller v. Frank's Nursery & Crafts, Inc.*, 957 F. Supp. 150, 153–54 (N.D. Ill. 1997) (refusing to allow minor Plaintiffs to disaffirm arbitration clause in employment application where they had already enjoyed the benefit of employment). However, these cases did not specifically address the question of whether the minors' parents or guardians entered into the agreement on the minor's behalf.

Unlike the agreements in those cases, here, nothing in the plain language of the Terms and Conditions or the consent forms indicate that the Guardians were agreeing to the Terms or executing the consent forms on behalf of the Plaintiffs, whether in addition to their Guardians or independent of their Guardians.  Nor did the Plaintiffs physically sign the user agreements or register for an account separate from their Guardians. Finally, nothing in the record indicates that Plaintiffs activated their own DNA tests or otherwise engaged independently with Defendant's services so to conclude that they manifested an independent intent to be bound by Defendant's Terms and Conditions when the Guardians completed the consent forms.  Thus, the Court declines to find that the Guardians executed the Terms and Conditions or consent forms on behalf of Plaintiffs.

## II.     Equitable Principles

Although Plaintiffs did not assent to the specific terms of the Terms and Conditions, Plaintiffs, as non-signatories to their Guardians' user agreements, may still be bound to the arbitration clause in the Terms and Conditions.  Illinois recognizes that non-signatories may be bound to an arbitration agreement under theories such as agency, estoppel and third-party beneficiary status. *Applications Software Tech. LLC v. Kapadia*, No. 18 CV 822, 2018 WL 3122173, at *5 (N.D. Ill. June 26, 2018) (citing *Equistar Chemicals, LP v. Hartford Steam Boiler Inspection & Ins. Co. of Connecticut*, 379 Ill. App. 3d 771 (2008)). Relevant here, Defendant argues that Plaintiffs received the benefit of using Defendant's services which would not have been possible without their Guardians' accounts, and those accounts are subjected to Defendant's Terms and Conditions and arbitration provisions.

"Estoppel is an equitable doctrine that prevents a non-signatory from refusing to comply with an arbitration clause when it receives a "direct benefit" from a contract containing an arbitration clause." *A.D.*, 885 F.3d at 1057, 1064 (applying Nevada Law) (internal quotations omitted); *Everett*, 771 F.3d at 383 (applying Wisconsin law) ("[A] non-signatory party is estopped from avoiding arbitration if she 'knowingly seeks the benefits of the contract containing the arbitration clause.'").  "[I]n order to trigger the doctrine the benefit received by the non-signatory must flow directly from the agreement" and not from the non-signatory's "ability to exploit the contractual relationship" *Id.* (quoting *Zurich Am. Ins. Co. v. Watts Indus.*, 417 F.3d at 682, 687 (7th Cir. 2005); *MAG Portfolio*

*Consult, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001); *Thomson-CSF,*

*S.A. v. Am. Arb. Ass'n*, 64 F.3d 773 (2d Cir. 1995).

The Seventh Circuit has observed that there "is a relative dearth of precedent

regarding direct benefits estoppel." *Everett*, 771 F.3d at 384.  Therefore, there is little

guidance to flesh out the distinction between direct and indirect benefits.  However,

*Everett*, 771 F.3d at 384 is an example of a direct benefit.  There, the Seventh Circuit found

that an individual shareholder received a direct benefit from a company's franchise

agreement with defendant, despite not being a signatory to the agreement, because the

agreement allowed the shareholder to act on her ownership interest in the company, and

she was "actively involved in operating the franchise" and receiving economic profits

from the company.  *Id.*  Therefore, the Circuit reasoned that without the franchise

agreement, the company and the business it operated, and the shareholder's ownership

interest which provided the benefit, would not have existed.  *Id.*  Accordingly, the

shareholder could not avoid an arbitration clause in the company's franchise agreement.

*Id.* Whereas, in *A.D.*, 885 F.3d at 1057, the Seventh Circuit found that a minor's use of her

guardian's credit card to purchase smoothie drinks was an indirect benefit of her

guardian's credit card agreement because the purchase was made at the direction of the

guardian.

As another district court recently opined, the Seventh Circuit's decision in *A.D.*,

885 F.3d at 1057 "shows that direct benefits can flow in at least two ways.  First, a party

can benefit directly by seeking to sue on the arbitration clause even if they are not a

signatory.[14]  Second, under certain circumstances, the party may seek to benefit from the agreement containing the arbitration clause."  *Elsasser v. DV Trading, LLC*, 444 F. Supp. 3d 916, 928 (N.D. Ill. 2020).  Defendant contends that Plaintiffs benefited directly under the Terms and Conditions by using Ancestry's services to receive the results of their processed DNA Tests.  Indeed, without the Guardians' accounts and assent to Ancestry's Terms and Conditions, Plaintiffs would not have been able to use Defendant's services because they were minors.  (*See* Doc. 21-12, pp. 3-6; 21-6, pp. 3-5) ("You must be at least 18 years old to purchase or active a DNA kit."); (Doc. 21-12, pp. 3-6; 21-6, pp. 3-5) ("The Websites and Services provided herein are intended for adults. When a minor uses the Websites, the parent or guardian of that minor will be held responsible for the minor's actions.").

Plaintiffs refute the general allegation that they used Defendant's services. Instead, Plaintiffs argue that their Guardians acted unilaterally – and in purported violation of their user agreements – in submitting Plaintiffs' DNA to Defendant. (*See* Doc. 27, p. 14) ("[N]one of the Plaintiffs *used* Defendant's website *or* any of Defendant's services and received nothing in consideration for their alleged promise to arbitrate their claims. Instead, it was Plaintiffs' guardians who used Defendant's services to learn more about Plaintiffs' genetic history—not Plaintiffs."); (Doc. 19, ¶ 48) ("Plaintiffs [H.S. and B.H.] did not agree, nor did they have the capacity to understand or agree to have their

---

[14]This theory is not applicable here because Plaintiffs are not pursuing contractual claims based on Defendant's alleged breach of the relevant agreements.  Instead, Plaintiffs bring a statutory claim under GIPA for Defendant's alleged mishandling of their genetic data.

genetic material to be provided to Ancestry.com").[15]   Plaintiffs also suggest that the Guardians never shared the results of Defendant's processing of the Plaintiffs' DNA tests with Plaintiff (*See* Doc. 19, ¶ 32) ("Plaintiff Coatney's genetic material was sequenced by Ancestry.com which then provided his mother – not Plaintiff Coatney – with information derived from his genetic test.").[16]

Without some showing that Plaintiffs physically accessed their Guardians' accounts or received their DNA results it is hard to imagine what benefit – direct or otherwise – Plaintiffs received from the processing of their DNA.  Even assuming that Defendant's processing of their DNA, and the alleged knowledge that could be obtained from that process, confers a benefit to Plaintiffs, without a showing that the minors realized or took advantage of that benefit, the Court fails to discern how Plaintiffs could have received that benefit.  Unlike the individual shareholder in *Everett*, 771 F.3d at 384 who unquestionably received a value associated with the franchise agreement by asserting her ownership powers and receiving economic benefits, here Plaintiffs have alleged that they never accessed Defendant's services or the results of their DNA tests.

Defendant argues that the actual receipt *by Plaintiffs* of their DNA results is irrelevant to whether a benefit was conferred (*See* Doc. 21, n. 9). The Court disagrees. Estoppel, with its inherent notions of equity, requires the receipt of a benefit, not merely

---

[15] *See also*, (Doc. 27, p. 4) ("No Plaintiffs ever utilized any services offered by Defendant. Instead, each of Plaintiffs' guardians allegedly checked boxes on Defendant's website when activating DNA test kits.").

[16] *See also*, (Doc. 19, ¶ 46) ("Plaintiffs H.S. and B.H.'s genetic materials were sequenced by Ancestry.com which then provided their guardian with information derived from their genetic tests."); (Doc. 19, ¶ 60) ("Plaintiff N.S.'s genetic material was sequenced by Ancestry.com which then provided her guardian with information derived from her genetic tests.").

a conferral of a benefit. *See, e.g., A.D.*, 885 F.3d at 1059, 1064 ("Estoppel is an equitable doctrine that prevents a non-signatory from refusing to comply with an arbitration clause when it ***receives*** a "direct benefit" from a contract containing an arbitration clause." (emphasis supplied); *Everett*, 771 F.3d at 383 ("As the name suggests, in order to trigger the doctrine [of directs benefit estoppel] the benefit ***received*** by the non-signatory must flow directly from the agreement.") (emphasis supplied).

At best, Defendant offers Plaintiffs a potential or inchoate benefit more analogous to that found in the facts of *A.D.*, 885 F.3d at 1057, where the minor's use of her guardian's credit card was made to purchase smoothie drinks. Although it was plausible that *A.D.* could have used her guardian's credit card for her own benefit by purchasing items for herself, there were no allegations that she did so. *See A.D.*, 885 F.3d at 1064 (rejecting the argument that the minor had the ability to use her guardian's credit card to make purchases because any "benefit" received "was limited to following her mother's directions to pick up the smoothies that her mother had order previously. This limited direction derived from the mother-daughter relationship" and not a relationship with defendant). Thus *A.D.* derived no benefit from the access to defendant's credit card services.

Similarly, here, although the minor Plaintiffs had theoretical access to Defendant's services through their Guardians' accounts, and likely a right to access the results of their DNA tests, there are no allegations that Plaintiffs did either. Instead, the allegations in the Amended Complaint indicate the opposite. Thus, the Court declines to find that this amorphous access to the benefit of Defendant's services is enough to bind Plaintiffs to the

agreement and its arbitration clause. *See, e.g.*, *Zurich Am. Ins. Co.*, 417 F.3d at 688 (alleged benefits which are "too attenuated and indirect" cannot force arbitration under an estoppel theory). Defendant's other equitable arguments are also unpersuasive, and largely undeveloped. *See Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 860 (7th Cir. 2017) (citing *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.")). Thus, the Court declines to find that these other equitable principles somehow bind Plaintiffs to the arbitration clause.

## Conclusion

For these reasons, Defendant's Motion to Stay (Doc. 21) is **DENIED**.

By separate order, the Court will track this case and set this matter for a scheduling conference.

**SO ORDERED.**

Dated: September 30, 2022

_____
DAVID W. DUGAN
United States District Judge